UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTOINETTE ALPHONSE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil No. 3:02cv1195 (MRK) |
| | : |
| STATE OF CONNECTICUT | : |
| DEPARTMENT OF ADMINISTRATIVE | : |
| SERVICES, | : |
| | : |
| Defendant. | : |

**MEMORANDUM OF DECISION**

In this action, Plaintiff Antoinette Alphonse ("Ms. Alphonse"), an African-American female, sued Defendant State of Connecticut Department of Administrative Services ("DAS") for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. DAS has now moved for summary judgment, and for the reasons set forth below, the Court GRANTS DAS' Motion for Summary Judgment [doc. #16].

**I.**

The material underlying facts are not in dispute.[1] Ms. Alphonse has worked for various agencies of the State of Connecticut since 1981, and she is currently employed by DAS. Def.'s 56(a)(1) ¶ 1; Pl.'s 56(a)(1) ¶ 1. In September 1988, Ms. Alphonse laterally transferred to DAS as

---

[1] The facts are derived from: Complaint [doc. #1] ("Compl."); Defendant's Statement of Material Facts Not in Dispute [doc. #18] ("Def.'s 56(a)(1)"); Deposition of Antoinette Alphonse, *id.*, Exhibit A, ("Alphonse Depo."); Deposition of William Wallace, *id.*, Exhibit B ("Wallace Depo."); Affidavit of David Krayeski, *id.*, Exhibit D ("Krayeski Depo."); Plaintiff's Local Rule 56(a)(2) Statement [doc. #23] ("Pl.'s 56(a)(2)"); Transcript of Oral Argument.

a Personnel Officer 2 in the Human Resources Business Center ("HRBC") with responsibilities in the Quality Assurance Unit. Def.'s 56(a)(1) ¶ 3; Pl.'s 56(a)(2) ¶ 3; Alphonse Depo. at 16. Before transferring to DAS, Ms. Alphonse had been a Personnel Officer 2 at the Department of Children and Families ("DCF"). Def.'s 56(a)(1) ¶ 2; Pl.'s 56(a)(2) ¶ 2.

In an August 19, 1998 letter offering Ms. Alphonse a position in DAS, David Krayeski, a DAS Personnel Officer, informed her that, although she would be hired by DAS as a Personnel Officer 2, if her work was satisfactory, she would be promoted to a Human Resources Consultant ("HR Consultant") position in six months. Def.'s 56(a)(1) ¶ 5; Pl.'s 56(a)(2) ¶ 5; *see also id.*, Ex. 1. A Personnel Officer 2 position is classified at the MP 60 level on the state's pay scale, while the HR Consultant position, which is a DAS specific title, is classified as an MP 63 position and pays between $63,000 to $81,000 per year. Def.'s 56(a)(1) ¶ 6; Pl's 56(a)(2) ¶ 6.

Within one month of being hired, Ms. Alphonse asked to be reclassified to a higher level position, and within four months of being hired, in January 1999, DAS promoted Ms. Alphonse from Personnel Officer 2 to HR Consultant, as promised in Mr. Krayeski's August 19, 1999 letter. Def.'s 56(a)(1) ¶ 8; Pl.'s 56(a)(2) ¶ 8. By the summer of 1999, however, Ms. Alphonse was again dissatisfied with her classification (and its salary rate), and she asked DAS to conduct an Objective Job Evaluation ("OJE") for her position and the positions of her staff, for the purpose of upgrading their positions and increasing their compensation. Def.'s 56(c)(1) ¶ 13; Pl.'s 56(c)(2) ¶ 13. An OJE is an objective evaluation of a position or an entire classification of positions in order to establish the appropriate pay grade for the position or classifcation. *Id.* The OJE for Ms. Alphonse's position and for her staff was conducted by Trish Doyle, who determined that everyone in the Quality Assurance Unit – including Ms. Alphonse – should be

2

working at a lower pay grade. Def.'s 56(a)(1) ¶13; Pl.'s 56(a)(2) ¶13.[2] Accordingly, Ms. Doyle recommended that all positions in the Quality Assurance Unit, including Ms. Alphonse's, be downgraded, or reclassified, to lower level positions. Ms. Alphonse does not claim that Ms. Doyle's recommendations were racially motivated or discriminatory. Alphonse Depo. at 34-35; Def.'s 56(a)(1) ¶13; Pl.'s 56(a)(2) ¶13. Despite Ms. Doyle's conclusion that Ms. Alphonse and her employees should be reclassified to lower level positions, DAS did not accept Ms. Doyle's recommendations, and, in fact, DAS later upgraded three of the positions (not including Ms. Alphonse's) for which Ms. Doyle had recommended downgrades. Alphonse Depo. 25-27.

Throughout 1999 and again at the end of 2000, Ms. Alphonse asked her supervisor, David Krayeski, on approximately five occasions to be reclassified to a higher pay grade or job title because she believed that she was performing more duties than her position entailed. Alphonse Depo. at 42.[3] Each time, Mr. Krayeski declined Ms. Alphonse's request, though Ms. Alphonse acknowledges that she never applied in writing for a new job title or higher pay. *Id.* at 43. Ms. Alphonse concedes that, her requests for promotion or higher pay notwithstanding, since Ms. Alphonse's arrival at DAS in September 1998, there have not been any promotional vacancies in the HRBC for levels above the HR Consultant. Def.'s 56(a)(1) ¶ 17; Pl.'s 56(a)(2) ¶ 17. In her deposition, Ms. Alphonse states that whenever she asked for a job enhancement, there were no positions to which she could have been promoted; rather, each of her requests was for a

---

[2] Ms. Doyle did not perform the "desk audit" component of the OJE, though Ms. Alphonse conceded that the desk audit is not a requirement. Alphonse Depo. at 34-35.

[3] When Ms. Alphonse was hired by DAS, she reported to Jospeh Lefkowski but she later reported to Mr. Krayeski. Def.'s 56(a)(1) ¶ 7; Pl.'s 56(a)(2) ¶ 7. Mr. Krayeski at all relevant times was the DAS manager in the HRBC. Krayeski Affidavit ¶ 1.

3

5% increase within her same job class. Alphonse Depo. at 46.

Although Ms. Alphonse was classified and compensated at the highest pay scale for an HR Consultant at DAS and although there were no higher positions available at HRBC during the relevant time period, Ms. Alphonse insists that DAS could have, and should have, increased her compensation by designating her as a "Transitional Manager" or classifying her as a VR 99 pay scale, either of which actions would have allowed DAS to give Ms. Alphonse a raise. Def.'s 56(a)(1) ¶ 20; Pl.'s 56(a)(2) ¶ 20. In support of her assertions, Ms. Alphonse points to two DAS employees, both Caucasians, whom Ms. Alphonse claims were similarly situated to her and who received either a Transitional Manager designation or VR 99 classification. Ms. Alphonse claims that DAS's failure to treat her in the same manner in which it treated these employees was due to her race.

Ms. Alphonse's claims regarding the Transitional Manager position focus on William "Skip" Wallace, who was responsible for the Quality Assurance Unit before Ms. Alphonse transferred into DAS in 1998. Def.'s 56(a)(1) ¶ 21; Pl.'s 56(a)(2) ¶ 21. At that time, Mr. Wallace had worked at DAS for 11 years, following four and one-half years at the Department of Mental Health and five years at UCONN in human resources functions. *Id.* For his first seven years at DAS, Mr. Wallace had served as the Assistant Agency Personnel Administrator, second in charge of the Human Resources office, with responsibility for all human resources functions in the agency. Def.'s 56(a)(1) ¶ 21; Pl.'s 56(a)(2) ¶ 21. As Assistant Agency Personnel Administrator, Mr. Wallace held the job classification of a "Personnel Manager," which is one position above an HR Consultant on the promotional ladder; a Personnel Manager is paid at the MP 65 level, whereas an HR Consultant, such as Ms. Alphonse, is paid at the MP 63 level.

In mid-to-late 1994, Mr. Wallace shifted his professional focus from human resources to information technology ("IT") duties. At about the same time, DAS was undergoing a reorganization and Mr. Wallace's title at DAS was changed from Assistant Agency Personnel Administrator to "Transitional Manager." Def.'s 56(a)(1) ¶¶ 23, 25; Pl.'s 56(a)(2) ¶¶ 23, 25; Alphonse Depo. at 62. When he was designated Transitional Manager in 1994, Mr. Wallace maintained the same salary (though on a different pay scale) that he had previously received as a Personnel Manager.[4] Def.'s 56(a)(1) ¶ 25; Pl.'s 56(a)(2) ¶ 25. It is undisputed, therefore, that when Mr. Wallace was designated a Transitional Manager, he did not receive any additional compensation but simply maintained his previous salary and MP 65 pay rating. It is also undisputed that as an MP 63 Ms. Alphonse received less compensation than Mr. Wallace even though she performed duties that were comparable to those of Mr. Wallace. Ms. Alphonse also testified, and this Court assumes, that when Mr. Wallace left DAS in the fall of 1998, additional duties were assigned to Ms. Alphonse's unit that Mr. Wallace had not performed while he was

---

[4]The job description of a Transitional Manager, available at http://www.das.state.ct.us/hr/Jobspec/JobDetail.asp?FCC=301, states that this designation is used in one of two ways:
    1. Implements transition of managers from positions which have been eliminated through agency reorganization to new positions identified as needed within the organization. Incumbents in this class will be trained as necessary to assume a new set of responsibilities and master a new set of job knowledges and skills.
    2. Utilized for specific managerial positions where job duties are not yet fully defined in agencies undergoing a significant reorganization. This permits the agency to define and implement the most effective organizational structure to achieve its mission.
    **Training Requirement:** The training and/or transition period shall not exceed three years. Prior to expiration of the three year training and/or transition period incumbents in this class must become eligible for permanent appointment to the target class.

with DAS. Alphonse Depo. at 112.[5] However, Ms. Alphonse acknowledges that those additional duties were not higher level duties; rather, she states that the additional duties are lower level duties. *Id.* at 112-13.

Ms. Alphonse's claims relating to the VR 99 classification focus on Susan Lizee, who was a DAS HR Consultant but who in July 2000 was moved from the MP 63 pay designation for HR Consultants to a VR 99 classification and was given a 5% raise. Alphonse Depo. at 50.[6] It is undisputed that Ms. Lizee received her VR 99 classification and 5% pay increase in connection with her transfer from DAS to function as the Human Resources Administrator or Director ("HR Director") for the state's Board of Education and Services for the Blind ("BESB") immediately after a large sexual harassment scandal emerged and the former director of BESB was forced to resign. Def.'s 56(a)(1) ¶ 19; Pl.'s 56(a)(2) ¶ 19. Ms. Alphonse acknowledges that classification as a VR 99 does not necessarily entail a salary increase and that any such increase would be wholly discretionary, Alphonse Depo. at 63; that Ms. Lizee assumed the job duties of an HR Director and functioned as the chief human resources officer at BESB, *id.* at 51-52; and that, at DAS, an HR Director is two promotional levels above an HR Consultant. *Id.*; Krayeski Aff. ¶ 5. Ms. Alphonse does not claim her duties at HRBC were comparable to the higher level duties that Ms. Lizee assumed and performed at BESB. Alphonse Depo. at 53. Even though their duties

---

[5] As of May 15, 2003, the date of Mr. Wallace's deposition, Mr. Wallace was employed in the Department of Mental Health and Addiction Services within the office of the Commissioner of the Human Resources Office. Wallace Depo. at 5. Mr. Wallace assumed that position in October of 1998. *Id.* His current position is Human Resource Information Manager, and his official title is Principal Personnel Officer. *Id.*

[6] Ms. Alphonse contends, and the Court will assume it is true for the present purposes, that VR 99 is a variable rate and an alternate pay plan that would allow Ms. Alphonse to receive a raise within her salary group. Alphonse Depo. at 46.

were not comparable, Ms. Alphonse asserts that in 1999 and 2000 she was performing functions beyond her job classification and in that respect her situation was comparable to Ms. Lizee's. *Id.* Ms. Alphonse asserts that, despite this alleged similarity with Ms. Lizee, Ms. Alphonse was not given a VR 99 rating and the discretionary raise that Ms. Lizee received, and that the reason for the difference in treatment was because of Ms. Alphonse's race. *See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 11.

Accordingly, on or around August 16, 2001, Ms. Alphonse filed a charge of employment discrimination on the basis of race and color with the Equal Employment Opportunity Commission, and on May 29, 2002, Ms. Alphonse was issued a right to sue letter. Compl. ¶ 4. Ms. Alphonse timely commenced this lawsuit, which seeks declaratory, injunctive, and compensatory relief. *Id.* ¶ 5.

## II.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.

R. Civ. P. 56(e). The Court must draw all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Andersen,* 477 U.S. at 249-50.

The Second Circuit has cautioned that district courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1210, 1224 (2d Cir. 1994)). However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id.* "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir. 1995) (quoting *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

### A.

Ms. Alphonse's Complaint asserts a claim for discriminatory failure to promote. Compl. at 9. The Second Circuit has stated that "[i]n *McDonnell Douglas*, the Supreme Court provided a framework for a *prima facie* case based on an alleged discriminatory failure to promote as follows: plaintiff must allege that (1) she is a member of a protected class; (2) she applied and

was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Ms. Alphonse is a member of a protected class. However, even though the threshold for establishing a *prima facie* case is admittedly quite low – *see Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) – Ms. Alphonse has not demonstrated on the basis of the undisputed facts that she satisfies the other requirements of a *prima facie* case for discriminatory failure to promote.

First, the Court notes that Ms. Alphonse's counsel represented to the Court at oral argument that she had abandoned her claim that she should have been promoted to the position of Personnel Manager. *See* Compl. ¶¶ 20-27. That is because, as she conceded at her deposition, at all relevant times, there was no Personnel Manager position being used at HRBC, nor anywhere else in DAS. Alphonse Depo. at 54-55; Def.'s 56(a)(1) ¶ 15; Pl.'s 56(a)(2) ¶ 15.

Second, focusing instead on the position of Transitional Manager, to which Mr. Wallace was designated long before Ms. Alphonse arrived at DAS, there is no evidence in the record to suggest that DAS was at any relevant time seeking applicants for a Transitional Manager position. It is undisputed that as HR Consultant, Ms. Alphonse was classified and compensated at the highest pay scale available for that position. Krayeski Affidavit ¶ 9. It is also undisputed that since Ms. Alphonse's arrival at DAS in September 1998, there have not been any vacancies in the HRBC for promotional levels above the HR Consultant level. *Id.* ¶ 7. Furthermore, while Ms. Alphonse testified at her deposition that she repeatedly asked Mr. Krayeski for a raise or a

9

promotion and that she asked to be promoted to the position of Personnel Manager – which, as described above, is a position that did not exist at DAS during the relevant time period – there is no evidence that Ms. Alphonse ever asked to be designated a Transitional Manager or ever applied for a position as a Transitional Manager.

The Second Circuit has been unequivocal when it has addressed discriminatory failure to promote claims that "[t]o establish a *prima facie* case of discriminatory failure to promote, a plaintiff must allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting than on several occasions she or he generally requested promotion." *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (citation and quotation marks omitted). Since it is undisputed that Ms. Alphonse never applied to DAS for an open position as Transitional Manager and that there was no such opening available, it follows that she most certainly could not have been rejected for the position, and, further, the position could not, then, thereafter have remained open while DAS continued to seek applicants having Ms. Alphonse's qualifications, all as required for a *prima facie* case. *See Brown,* 163 F.3d at 709. Accordingly, DAS is entitled to judgment on Ms. Alphonse's discriminatory failure to promote claim. *See, e.g., Kinsella*, 320 F.3d at 314-15; *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566-67 (2d Cir. 2000).

**B.**

As Ms. Alphonse's counsel acknowledged at several points during oral argument, this case is not about a failure to promote Ms. Alphonse but rather it is about an alleged failure to give Ms. Alphonse a pay increase in view of her responsibilities and job duties and the purportedly disparate manner in which DAS treated Mr. Wallace and Ms. Lizzee, both of whom

were Caucasian.

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Like her failure to promote claim, Ms. Alphonse's pay discrimination claim is also governed by the three-part *McDonnell Douglas* burden-shifting framework .

Under this analysis, a plaintiff is initially required to establish a *prima facie* case of discrimination by showing that "(1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 767 (2d Cir. 2002); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43 (2000). If the plaintiff succeeds in establishing a *prima facie* claim of discrimination, "a presumption of discrimination arises and the burden shifts to the defendant to proffer some legitimate, nondiscriminatory reason for the adverse decision or action." *Mario*, 313 F.3d at 767. "If the defendant proffers such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant 'will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" *Id*. (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)). The burden thus shifts back to the plaintiff to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its

true reasons but were a pretext for discrimination." *Id.* (quoting *Reeves*, 530 U.S. at 143). Presenting evidence suggesting that the employer's justification is false is not necessarily enough for a plaintiff to survive a summary judgment motion. *See, e.g., Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000). The Court must not rely solely on a plaintiff's rebuttal of the employer's explanation but must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Reeves*, 530 U.S. at 143).

It is undisputed that Ms. Alphonse satisfies the first two prongs of the *prima facie* test. Also, she repeatedly requested a pay increase and did not get one, which arguably fulfills the adverse employment action requirement. *Sanders v. New York City Human Res. Admin.*, No. 02-7624, 2004 U.S. App. LEXIS 4892, at *10 (2d Cir. March 16, 2004) (examples of adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation").

The fourth element of Ms. Alphonse's *prima facie* burden presents a closer question. "A showing of disparate treatment – that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group – is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). However, "[a] plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *see Shumway*, 118 F.3d at 64. For reasons discussed

below, the Court is not persuaded that Ms. Alphonse was similarly situated to either Mr. Wallace or Ms. Lizee in terms of the issue of compensation.[7] However, the Court need not, and emphasizes that it does not, rest its decision on Ms. Alphonse's failure to satisfy her *prima facie* case. Instead, the Court concludes that on the basis of the undisputed evidence that no reasonable juror could conclude that DAS's articulated reason for the pay disparity between Ms. Alphonse and Mr. Wallace or Ms. Lizee was pretextual *and* that the real reason for the disparity was racial animus. *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 317 (2d Cir. 1999).

As to Mr. Wallace, DAS has asserted that the reason his compensation was higher than Ms. Alphonse's is that Mr. Wallace was paid at the MP 65 level while Ms. Alphonse was paid at the MP 63 level, after her promotion in January 1999. It is undisputed that Mr. Wallace, who had many more years of state service than Ms. Alphonse, held an MP 65 pay rating long before Ms. Alphonse ever joined DAS and that he had been an MP 65 for nearly seven years before he was designated as a Transitional Manager in 1994. Def.'s 56(a)(1) ¶¶ 21, 25. Furthermore, while

---

[7] Furthermore, in response to the Court's questions at oral argument, counsel for Ms. Alphonse asserted that the decisionmakers for all pay decisions involving Ms. Alphonse, Mr. Wallace and Ms. Lizee were Barbara Waters and Alan Mazzola, the Commissioner and Deputy Commissioner, respectively, for DAS. However, counsel also acknowledged that he has no evidence of any racially discriminatory comments by either individual to Ms. Alphonse or anyone else at DAS and there is no evidence that Ms. Alphonse ever even spoke to either individual about her request for an increased pay. Moreover, Ms. Alphonse's counsel stated that it was Ms. Waters and Mr. Mazzola who made the decision to hire Ms. Alphonse in 1998 and to promote her and give her a pay raise in 1999, facts that would tend to undercut any claim of discriminatory animus on their part. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring."); *see also Wood v. Sophie Davis School*, No. 02 Civ. 7781, 2003 WL 22966288, at *4 n.14 (S.D.N.Y. Dec. 15, 2003) ("While *Grady* involved an individual who hired and fired the plaintiff rather than an actor who hired and failed to promote an individual, the theory behind the same-actor inference is the same.").

Mr. Wallace may have held the designation of a Transitional Manager while Ms. Alphonse (whom the Court assumes performed the same duties as Mr. Wallace) did not, it is undisputed that holding the title of Transitional Manager did not get Mr. Wallace one penny more in terms of compensation. He was paid as an MP65 before he was designated a Transitional Manager and he continued to be paid as an MP 65 after he became a Transitional Manager. As a consequence, at argument, counsel for Ms. Alphonse acknowledged that being designated a Transitional Manager does not entitle an employee to a raise. Thus, for purposes of evaluating Ms. Alphonse's pay increase claim, the fact that Mr. Wallace was designated a Transitional Manger, while Ms. Alphonse was not, is irrelevant. In short, as Ms. Alphonse's counsel ultimately conceded at argument, Mr. Wallace does not help Ms. Alphonse's pay increase claim.

    That leaves Ms. Lizee as Ms. Alphonse's only evidence in support of her disparate pay claim. It is undisputed that DAS designated Ms. Lizee a VR 99 and gave her 5% pay increase in July 2000 because Ms. Lizee assumed the functions of an HR Director when she was transferred to BESB in July 2000. It is also undisputed that a HR Director is two promotional levels above the position that Ms. Alphonse held in July 2000. More importantly, Ms. Alphonse conceded at her deposition that her duties were not at all comparable to Ms. Lizee and that Ms. Lizee assumed and performed higher level functions than Ms. Alphonse when Ms. Lizee was transferred to BESB.[8] Alphonse Depo. at 53. On the basis of the undisputed evidence, therefore,

---

    [8] Ms. Alphonse argues that she and Ms. Lizee are similarly situated because Ms. Alphonse assumed "additional" duties beyond her occupational class. Alphonse Depo. at 53. However, she admits that the additional duties she assumed were *lower* level duties and that by contrast, Ms. Lizee assumed additional *higher* level duties. *Id.* at 113. Moreover, Ms. Doyle's OJE in 1999 found that Ms. Alphonse was actually over-classified for the functions she was then performing. *Id.* at 115. There is no evidence of any similar OJE finding with respect to Ms. Lizee.

it is clear that Ms. Lizee and Ms. Alphonse are not similarly situated. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999) (finding that the district court did not err in granting judgment as a matter of law on plaintiff's race discrimination claim because plaintiff failed to produce sufficient evidence to establish at trial that she was similarly situated to white employees in all material respects, and, thereby, did not establish a *prima facie* case).

      Finally, and in any event, Ms. Alphonse acknowledges that being classified as a VR 99 does not automatically entitle an employee to a pay increase and that any such increase is discretionary with DAS. Alphonse Depo. at 63. Here, DAS asserts that it gave Ms. Lizee the 5% increase because she was moving into a difficult and tumultuous situation at BESB and performing higher level duties than she had previously performed or that Ms. Alphonse performed. There is no evidence in the record from which a trier of fact could conclude that DAS' articulated reasons were false, let alone that DAS' real reason for treating Ms. Lizee differently from Ms. Alphonse was racial animus. Speculation about DAS's motives is not sufficient to entitle a litigant to present a claim to a jury. *See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 99 (2d Cir. 2001) ("Plaintiffs failed to produce any evidence, other than conclusory statements unsupported by the record, to rebut the legitimate, nondiscriminatory reasons offered by [defendant], let alone evidence that could reasonably support a verdict in their favor. We therefore affirm the order of summary judgment dismissing the discrimination claims.") (citation omitted); *see also Barriera v. Bankers Trust*, No. 98 Civ. 3641, 2003 WL 22387099, at \*6 (S.D.N.Y. Oct. 20, 2003) (finding that conclusory allegations about being the victim of race discrimination, without more, do not give rise to an inference of discriminatory motive).

      The Court is well aware that it should not usurp the jury's function and resolve factual

disputes on summary judgment. However, in this case, Ms. Alphonse has proved only that she was African-American and that one other employee of DAS, who was Caucasian, was paid 5% more than Ms. Alphonse when the other employee moved to a higher level job in a different agency in which she assumed higher level duties. Such a showing utterly fails to satisfy the standards that would permit the Court to send Ms. Alphonse's claim to a jury. *Simpri v. City of New York*, No. 00 Civ. 6712, 2003 WL 23095554, at *4 (S.D.N.Y. Dec. 30, 2003) ("Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where . . . plaintiff has offered little or no evidence of discrimination.") (citing *Scaria v. Ruib*, No. 94 Civ. 333, 1996 WL 389250, at *5 (S.D.N.Y. July 11, 1996), *aff'd*, 117 F.3d 652 (2d Cir. 1997)). "Summary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), where, as here, a plaintiff's argument is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Tojzan v. N.Y. Presbyterian Hosp.*, No. 00 Civ. 6105, 2003 WL 1738993, at *4 (S.D.N.Y. March 31, 2003).

### III.

For the foregoing reasons, DAS' Motion for Summary Judgment [doc. #16] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/        Mark R. Kravitz        
United States District Judge

Dated at New Haven, Connecticut: April 21, 2004.